# MACK LEWIS v. STATE.

No. A-9009.  April 3, 1936.
(56 Pac. [2d] 425.)

Robert Crockett and W. L. Ratliff, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, J.  The plaintiff in error, hereinafter for convenience referred to as the defendant, was by information charged with the crime of murder, tried and convicted of manslaughter in the first degree, and sentenced to serve a term of 15 years in the state penitentiary, and appeals.

The testimony on behalf of the state shows that on the 25th day of April, 1933, the deceased Arley or Billie Rowe, Dewey or Speck Rowe, Chester Niblett, and J. L. Patrick had been fishing on Rock creek, a stream about a quarter of a mile west of the Mack Lewis place; about 4 or 4:30 in the afternoon a cloud came up and it looked very much like there would be a heavy rain, and all

parties started toward the Mack Lewis home; before they reached the house they found a keg or container with about four gallons of mash or beer in the making; they took the container and carried it to the house and told the defendant what they had. It is further shown that the defendant invited the parties into the house, and told them to bring the beer in; the beer was taken into the house. There was present the defendant, his wife Ora Lewis, his stepdaughter Minnie Bell Lewis, and a young man by the name of Willie Keel or Cooper, and the defendant's minor children.

It is further shown the defendant got mad at the Rowe boys, got his .22 target rifle, and shot Arley or Billie Rowe while in the house. Rowe ran out of the door, and the defendant followed him and shot him the second time. The body of young Rowe was discovered about halfway from the Mack Lewis house to the road in front of the house. There were two bullet holes in his body, one in his right side, and the other in his head close to his left ear.

J. L. Patrick, who was present in the house when the trouble began, testified for the state, in substance:

"I went to the home of the defendant with the deceased, and before any trouble took place he was in the main room three or four feet inside the door going out of the dining room; Billie or Arley, Mack, Chester and myself were in the room at the time the shooting took place; Mack was in the dining room, his wife was also there; when he came into the big room he did not say anything, he just fired; I was sitting right here (indicating); I looked around; he shot from his hip, did not take aim; Billie was not doing anything at the time, he was kindly facing Mack, the defendant; the deceased whirled and fell, his hands out through the door and his feet towards the middle of the room; he made one or

two steps on his hands and feet kindly, and then came up as he was going off the east porch; the defendant backed back toward the kitchen and then whipped through the door and went in the same direction the deceased had gone; I did not hear any of the shooting on the outside of the house; the deceased did not have a knife in his hand, nor did he make any threats of any kind against the defendant. If he made any improper suggestions or threats against any member of the defendant's family I did not hear it; I saw nothing out of the way; I did not see him at any time put his hands on either Mrs. Lewis or the step-daughter; when the defendant went out of the room going in the same direction the deceased had gone he had the target gun with him; the Indian boy and I remained in the room; when Mack came back in the house he gobbled, and asked his wife for his shot gun. I am not a relative of either of the parties."

Other witnesses in substance corroborated the testimony of the witness Patrick as to what took place in the house before the shot was fired. There is a conflict in the testimony from the time the deceased and other parties went to the home of the defendant up until the time the shooting took place. The state's witnesses claim the defendant invited the deceased and other parties to come in, and to bring the beer. The defendant and his witnesses testifying he told them to come in and warm and dry their clothes but to leave the beer outside; that his wife did not want it brought in as there was a couple of the children sick; the beer was taken into the house, and the state witnesses drank the beer, and defendant admits he drank one cup of the beer.

The defendant contends he shot in self-defense because the deceased had insulted his wife and stepdaughter by attempting to kiss and hug them; that the deceased had drawn a knife and was coming toward him when the first shot was fired.

Willie Keel or Cooper, testifying for the defendant, made the following statement:

"The defendant had a gun that looked like this one; I think he got it out of the closet; I first saw the gun when he got it and shot; he told the boys to get out of the house and they kept cussing; they called him a black s— of a b——; he said, 'I don't want to have any trouble, boys, get out, this is my home and I have the right to protect it'; the boys cursed him; he pulled his gun and shot; just before Mack shot Arley Rowe he had a knife in his hand and was going toward Mack; there was a sofa or day bed between the deceased and the defendant; when the defendant fired Arley or Billie Rowe just kindly staggered back, he was close to the door when he was shot; when the first shot was fired Billie fell and I left; when he started to get up again he came toward Mack, I mean he turned when he got up and coming back toward Mack, they were going for each other, that is all I know; I guess Mack reloaded the gun; the sofa or day bed was between the deceased and Mack; I did not hear the second shot; I don't know whether it was fired in the house or on the outside."

The testimony on behalf of the defendant by Willie Keel, his wife Ora Lewis, and his step-daughter Minnie Bell Lewis show the deceased attempted to hug and kiss them, and the defendant tried to make him leave the house, and the deceased refused to do so, and the defendant says the deceased called him a black s— of a b——, and started coming toward him with a knife; he grabbed his target out of the closet and fired, and the deceased kind of fell out toward the door, got up and came toward him, and he fired a second shot.

The defendant admits there was a sofa or day bed between him and the deceased at the time the shot was fired. The testimony of the officers, and those who examined the scene of the trouble, and the clothes deceased

was wearing, show conclusively that the deceased did not have a knife on his person, and none was found in the house or along the line traveled from the time he left the house until he fell. There is a sharp conflict in the testimony of the state and the defendant.

The defendant has assigned as errors: The court erred in overruling his motion for a new trial; the verdict of the jury is contrary to the evidence and the law; the verdict of the jury is excessive, and is the result of passion or prejudice. The defendant in his brief presents only one question, that the verdict is contrary to the evidence and is not supported by the evidence; that the verdict is excessive. No authorities are cited by the defendant in support of his contentions. The only question left for this court to consider is the question: Is the evidence sufficient to sustain a verdict of guilty?

The jury in considering the evidence in this case, under the instructions of the court, by its verdict clearly shows that there was no bias or prejudice against the defendant. If it believed the evidence of the state, it would have returned a verdict of guilty of murder. On the other hand, if it believed the evidence of the defendant, it was a case of self-defense. The record discloses that an effort was made to invoke the unwritten law, and that the killing was in defense of the wife and daughter of the defendant. It is admitted that the defendant had a right to protect his home and his family against any insults that may be offered them, or any improper conduct indulged in by the parties in his home. If while in the home of the defendant the deceased by any act of his angered the defendant, or insulted any member of his family, the defendant would have the right to compel him to leave his home and would be justified in using such force as was necessary to compel the deceased to leave his home.

If the deceased had a knife, as claimed by the defendant, and was advancing on the defendant, he would be justified in protecting himself against such assault and to use such force as seemed necessary to him, from his standpoint, to prevent the deceased from doing him some great bodily harm or taking his life.

The legal rights of the defendant were properly presented to the jury in the court's instructions, and no exceptions were taken by the defendant. The conflict in the evidence in this case was a question for the jury, and this court has repeatedly held that in considering the sufficiency of the evidence the functions of this court are limited to ascertaining whether there is a basis in the evidence on which the jury could reasonably conclude the accused is guilty as charged and sufficient to support the verdict. Whitten v. State, 25 Okla. Cr. 447, 221 Pac. 115; Parnell v. State, 39 Okla. Cr. 361, 265 Pac. 660; Dixon v. State, 46 Okla. Cr. 25, 288 Pac. 357; Andres v. State, 51 Okla. Cr. 229, 1 Pac. (2d) 178.

There is no legal reason given by the defendant in this case why the court should set aside the verdict of the jury based upon the instructions of the court, and the testimony contained in the record. The evidence is sufficient to sustain the conviction. The defendant has failed to point out any error of the court sufficient to warrant this court in reversing the case.

The judgment is affirmed.

EDWARDS, P. J., and DOYLE, J., concur.